**FITZGERALD JOSEPH LLP**
JACK FITZGERALD (SBN 257370)
*jack@fitzgeraldjoseph.com*
PAUL K. JOSEPH (SBN 287057)
*paul@fitzgeraldjoseph.com*
MELANIE PERSINGER (SBN 275423)
*melanie@fitzgeraldjoseph.com*
TREVOR M. FLYNN (SBN 253362)
*trevor@fitzgeraldjoseph.com*
CAROLINE S. EMHARDT (SBN 321222)
*caroline@fitzgeraldjoseph.com*
2341 Jefferson Street, Suite 200
San Diego, California 92110
Phone: (619) 215-1741
***Counsel for Plaintiff***

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANN GRIEB, on behalf of herself, all others similarly situated, and the general public,<br><br>Plaintiff,<br><br>v.<br><br>CHURCH & DWIGHT CO., INC.,<br><br>Defendant. | Case No.: **'22 CV 1778 AJB RBB**<br><br>CLASS ACTION<br><br>**COMPLAINT FOR:**<br><br>**CONSUMER FRAUD, BREACH OF EXPRESS & IMPLIED WARRANTIES, NEGLIGENT AND INTENTIONAL MISREPRESENTATION, AND UNJUST ENRICHMENT**<br><br>DEMAND FOR JURY TRIAL |

*Grieb v. Church & Dwight Co., Inc.*
CLASS ACTION COMPLAINT

Plaintiff Ann Grieb, on behalf of herself, all others similarly situated, and the general public, by and through her undersigned counsel, bring this action against Church & Dwight Co., Inc. ("C&D" or "Defendant") and alleges the following upon her own knowledge, or where she lacks personal knowledge, upon information and belief, including the investigation of her counsel.

## INTRODUCTION

1.      This action seeks to remedy the unlawful, deceptive, and unfair business practices of C&D with respect to certain aerosol Batiste Dry Shampoos that reliable independent laboratory testing has confirm contain benzene (the "Dry Shampoos" or "Products").[1]

2.      Benzene is widely recognized as an incredibly dangerous substance that offers no benefit whatsoever and rather is categorized by the FDA and World Health Organization, among others, as a Group 1 carcinogen (the most carcinogenic category).

3.      Independent testing recently demonstrated that the Batiste Dry Shampoos contain benzene.

4.      Nevertheless, Defendant through its unlawful, deceptive, and unfair business practices regarding the manufacture, testing, labeling, and marketing, has sold and continues to sell benzene containing Batiste Dry Shampoos to consumers throughout the United States, including in California.

5.      The presence of benzene renders these Products "adulterated" and therefore illegal to be distributed and sold. Further, these Products are misbranded and deceptively

---

[1] Subject to further discovery, the Products challenged in this lawsuit at this time include the following Batiste brand dry shampoos: Dry Shampoo & a Hint of Color for Dark Hair - 6.73 fl. oz.; Dry Shampoo Bare - 4.23 fl. oz.; Dry Shampoo Clean & Classic Original - 6.73 fl. oz.; Dry Shampoo Clean & Light Bare - 6.73 fl. oz.; Dry Shampoo Clean & Light Bare - 6.73 fl. oz.; Dry Shampoo Dark Hair - 6.35 oz; Dry Shampoo Floral & Flirty Blush - 1.6 fl. oz.; Dry Shampoo Floral & Flirty Blush - 6.73 fl. oz.; Dry Shampoo Light & Breezy Fresh - 6.73 fl. oz.; Dry Shampoo Original Classic Fresh - 6.35 oz; Dry Shampoo Plus Brilliant Blonde - 6.73 fl. oz.; Dry Shampoo Plus Divine Dark - 1.6 fl. oz.; Dry Shampoo Plus Divine Dark - 6.73 fl. oz.

labeled because, *inter alia*, Defendant markets and labels them as being safe and effective for their ordinary use, while knowing (but omitting and not disclosing to consumers on its packaging) that the Products contain benzene (or at the very least that they are at the risk of containing benzene).

6.     Defendant knew or should have known the Batiste Dry Shampoos contained benzene (or at the very least that they are at the risk of containing benzene), yet it failed to disclose that to consumers anywhere on the Products' labeling.

7.     Plaintiff brings this action against C&D on behalf of herself, similarly-situated Class Members, and the general public to enjoin C&D from deceptively marketing the Batiste Dry Shampoos, and to recover compensation for injured Class Members.

## JURISDICTION & VENUE

8.     This Court has original jurisdiction over this action under 28 U.S.C. § 1332(d)(2) (The Class Action Fairness Act) because the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and at least one member of the class of plaintiffs is a citizen of a State different from Defendant. In addition, more than two-thirds of the members of the class reside in states other than the state in which Defendant is a citizen and in which this case is filed, and therefore any exceptions to jurisdiction under 28 U.S.C. § 1332(d) do not apply.

9.     The Court has personal jurisdiction over Defendant because it has purposely availed itself of the benefits and privileges of conducting business activities within California, including by marketing, distributing, and selling the Benzene Shampoos in California.

10.    Venue is proper in this Southern District of California pursuant to 28 U.S.C. § 1391(b) and (c), because Defendant resides (*i.e.*, is subject to personal jurisdiction) in this district, and because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## PARTIES

11.    Plaintiff Ann Grier is a resident of Chula Vista, California.

*Grieb v. Church & Dwight Co., Inc.*
CLASS ACTION COMPLAINT

12.     Defendant is C&D is a Delaware corporation with its principal place of business in Ewing, New Jersey.

## FACTS

## I.     BENZENE IS TOXIC AND A KNOWN HUMAN CARCINOGEN

13.     Benzene is a hydrocarbon molecule that can absorbed into the body via "inhalation, skin absorption, ingestion, skin and/or eye contact."[2]

14.     For nearly a century, benzene has been recognized as a serious health hazard and human carcinogen.[3] Among other harms, "Benzene causes central nervous system depression and destroys bone marrow, leading to injury in the hematopoietic system."[4] Benzene harms blood marrow so that it may cause it not to produce enough red blood cells, which can lead to anemia and can also lead to leukemia and other cancers of the blood cells.[5] Benzene can also damage the immune system by changing blood levels of antibodies and causing the loss of white blood cells.[6]

15.     Epidemiological studies have long shown that benzene is directly associated with cancer even at extremely low levels, leading researchers to conclude there is no safe level of exposure.

---

[2] Centers for Disease Control and Prevention, The National Institute for Occupational Safety and Health Pocket Guide to Chemical Hazards, Benzene Exposure Limits, *available at* https://www.cdc.gov/niosh/npg/npgd0049.html.

[3] Huff, J., "Benzene-induced cancers: abridged history and occupational health impact," Int'l J. Occupational and Env't Health (2007); *see also* U.S. Dept. of Health and Human Services National Toxicology Program, Report on Carcinogens, Fifteenth Edition (December 2021) (benzene is "a human carcinogen based on sufficient evidence of carcinogenicity from studies in humans."), *available at* https://tinyurl.com/bd9bc6n4.

[4] FDA Toxicological Data for Class 1 Solvents, Appendix 4, Benzene, *available at* https://www.fda.gov/media/71738/download.

[5] Centers for Disease Control and Prevention, Emergency Preparedness and Response, Chemical Emergencies, Facts About Benzene, *available at* https://emergency.cdc.gov/agent/benzene/basics/facts.asp.

[6] *Id.*

3

16.     For example, a study from 1939 on benzene concluded that "exposure over a long period of time to any concentration of benzene greater than zero is not safe."[7]

17.     Recent evaluations of data regarding benzene have reached the same conclusion.

18.     A 2003 study found that there is a "strong association between benzene exposure and the risk of acute and chronic leukemia" even for exposure levels as low as 0.8 parts per million ("ppm") and found "no evidence of a threshold cumulative exposure below which there is no risk."[8]

19.     In short, "[t]here is probably no safe level of exposure to benzene, and all exposures constitute some risk in a linear, if not supralinear, and additive fashion."[9]

20.     Unsurprisingly, governmental agencies and authoritative medical associations uniformly recognize that benzene is a known carcinogen in humans and categorize it in the highest tier of carcinogens.

21.     The International Agency for Research on Cancer ("IARC") is part of the World Health Organization ("WHO"). One of its goals is to identify causes of cancer. IARC classifies benzene as "carcinogenic to humans," based on sufficient evidence that benzene causes acute myeloid leukemia. IARC also notes that benzene exposure has been linked with acute lymphocytic leukemia, chronic lymphocytic leukemia, multiple myeloma, and non-Hodgkin lymphoma.[10]

22.     The National Toxicology Program is formed from parts of several different US government agencies, including the National Institutes of Health, the Centers for Disease

---

[7]  *See* Valisure, Valisure Detects Benzene in Sunscreen, *available at* https://www.valisure.com/valisure-newsroom/valisure-detects-benzene-in-sunscreen.

[8]  Glass, D., et al., "Leukemia Risk Associated With Low-Level Benzene Exposure," Epidemiology: September 2003 - Volume 14 - Issue 5.

[9]  Smith, M., "Advances in Understanding Benzene Health Effects and Susceptibility," Annu. Rev. Public Health. 2010; 31: 133–148.

[10]  American Cancer Society, Benzene and Cancer Risk, *available at* https://www.cancer.org/healthy/cancer-causes/chemicals/benzene.html.

*Grieb v. Church & Dwight Co., Inc.*
CLASS ACTION COMPLAINT

Control and Prevention (CDC), and the Food and Drug Administration (FDA). The NTP has classified benzene as "known to be a human carcinogen."[11]

23.     The US Environmental Protection Agency (EPA) maintains the Integrated Risk Information System (IRIS), an electronic database that contains information on human health effects from exposure to various substances in the environment. The EPA classifies benzene as a known human carcinogen.[12]

24.     The WHO and the IARC classify benzene as a Group 1 compound thereby defining it as "carcinogenic to humans."[13]

25.     Many governmental agencies and health organizations have likewise determined there is no safe level of exposure to benzene.

26.     For example, the World Health Organization has warned that "no safe level of [benzene] exposure can be recommended."[14]

27.     The Canadian government has warned that "Benzene affects the blood-forming system at low levels of occupational exposure ≤ 1 ppm," with "no evidence of a threshold," and that "[c]hronic exposure to benzene" can "cause leukemia, a cancer of the blood or bone marrow."[15]

---

[11] *Id.*

[12] *Id.*

[13] International Agency for Research on Cancer and World Health Organization, IARC Monographs on the Identification of Carcinogenic Hazards to Humans, *available at* https://monographs.iarc.who.int/list-of-classifications.

[14] World Health Organization, Exposure to Benzene: A Major Public Health Concern (2019) (available for download at https://www.who.int/publications/i/item/WHO-CED-PHE-EPE-19.4.2).

[15] Government of Canada, Guidance for Benzene in Residential Indoor Air, *available at* https://www.canada.ca/en/health-canada/services/publications/healthy-living/guidance-benzene-residential-indoor-air.html.

28.     Because there is no safe level of benzene exposure, the National Institute for Occupational Safety and Health ("NIOSH") recommends protective equipment be worn by workers exposed or expecting to be exposed to benzene at concentrations of 0.1ppm.[16]

29.     In short, Benzene is an incredibly dangerous and carcinogenic substance.

## II.     DISCOVERY OF BENZENE IN THE PRODUCTS

### A.     Risk of Contamination of Aerosol Products with Benzene

30.     "Aerosol products" are products that depend upon the power of a liquified or compressed gas to expel the contents from the container.

31.     Aerosol propellants use volatile hydrocarbons as their base. Common aerosol propellants for consumer products include butane, isobutane, and propane.

32.     Propellants like these are derived from crude oil and manufactured in oil refineries where a variety of other volatile hydrocarbons, including benzene, are produced.

33.     Benzene, butane, isobutane, and propane are "hydrocarbons," molecules comprised of only carbon and hydrogen atoms. Each is highly flammable and insoluble in water, but soluble with each other.

34.     Given that the manufacturing of butane, isobutane, and propane is done in an environment where high levels of benzene exist, there is a risk that hydrocarbon propellant products could become contaminated with benzene.

---

[16] Centers for Disease Control and Prevention, The National Institute for Occupational Safety and Health Pocket Guide to Chemical Hazards, Benzene Exposure Limits, *available at* https://www.cdc.gov/niosh/npg/npgd0049.html.

*Grieb v. Church & Dwight Co., Inc.*
CLASS ACTION COMPLAINT

35.     In fact, some companies even expressly warn that their aerosol propellants may contain benzene. For example, one chemical company, Whiting, disclosed this very fact in their Safety Data Sheet (SDS) for their butane product.[17]

## 2. Hazard Identification

Butane is a colorless gas having no odor. It is extremely flammable and explosive. Keep away from heat, sparks, and open flame. At high concentrations this product acts as a simple asphyxiant.

Large pressure drops in a butane process could result in temperatures low enough to cause frost bite.

DANGER!
FLAMMABLE LIQUEFIED GAS

LIQUEFIED GAS UNDER PRESSURE. MAY EXPLODE IF HEATED. PRODUCES SKIN IRRITATION UPON PROLONGED OR REPEATED SKIN CONTACT. MAY CONTAIN TRACE AMOUNTS OF BENZENE WHICH CAN CAUSE CANCER OR BE TOXIC TO BLOOD-FORMING ORGANS. MAY BECOME ASPHYXIANT IF RELEASED. UPON SUDDEN RELEASE OF PRESSURE, CAN CAUSE FROSTBITE WHEN IN CONTACT WITH SKIN.

NO SMOKING!
KEEP AWAY FROM HEAT/SPARKS/OPEN FLAMES/HOT SURFACES. WEAR PROTECTIVE GLOVES, CLOTHING AND EYE WEAR WHEN HANDLING.

36.     Further, as discussed below, over the last few years, numerous aerosol products (including sunscreens and body sprays) have been tested and found to contain benzene leading to highly publicized recalls and FDA investigations.

**B.     Testing of Aerosol Products for Benzene**

37.     Due to the substantial harm to humans caused by exposure to chemicals like benzene, certain organizations have been founded with the specific goal of preventing products adulterated with harmful chemicals from reaching consumers.

38.     One such organization is Valisure LLC, which tests products "to help ensure the safety, quality and consistency of [products] in the market."[18]

---

[17] Whiting, Safety Data Sheet for Butane, *available at* https://whiting.com/wp-content/uploads/Butane-SDS.pdf.

[18] *See* Valisure October 31, 2022 Citizen Petition on Benzene in Dry Shampoo Products ["FDA Citizen Petition"] (available for download at https://www.valisure.com/valisure-newsroom/valisure-detects-benzene-in-dry-shampoo).

*Grieb v. Church & Dwight Co., Inc.*
CLASS ACTION COMPLAINT

39.     Valisure operates an independent analytical laboratory that is accredited under International Organization for Standardization ("ISO") and is registered with the Drug Enforcement Administration and FDA.[19]

40.     Over the last few years, Valisure has tested a wide variety of aerosol products including sunscreens, antiperspirants and body sprays, hand sanitizers, and most recently, dry shampoos.[20]

41.     Valisure's testing of numerous aerosol products confirmed that many contained benzene (and other harmful chemicals). Valisure's testing results, which it submitted to the FDA in Citizen's Petitions, were widely publicized by news organizations and the media at large. As a result, there have been numerous high-profile recalls of aerosol products that were shown to contain benzene.[21]

42.     For example, in 2021, Valisure tested 108 unique batches of aerosol deodorants and antiperspirants (from 30 different brands) for chemicals including benzene and "detected high levels of benzene" in many of these batches.[22]

---

[19] *Id.*

[20] *See id.; see also* Valisure, Valisure's FDA Citizen Petitions, available at https://www.valisure.com/valisure-newsroom/valisures-fda-citizen-petitions.

[21] *See, e.g.,* CNET, Dry Shampoo Recall: What Is Benzene and Which Brands Are Affected https://www.cnet.com/health/personal-care/dry-shampoo-recall-what-is-benzene-and-which-brands-are-affected/ (identifying 19 types of dry shampoo have been recalled due to benzene content); *see also* Washington Post, Aerosol hair products tainted by benzene may still be on store shelves (November 1, 2022), *available at* https://tinyurl.com/4wje8fue ("Aerosol hair products tainted by benzene may still be on store shelves"); Ryan Basen, Medpage Today, After Valisure Petition, Ol' Dirty Benzene Forces Another Recall (November 30, 2021), *available at* https://www.medpagetoday.com/special-reports/exclusives/95929 ("After Valisure Petition, Ol' Dirty Benzene Forces Another Recall").

[22] Valisuer, Valisure Detects Benzene in Body Spray Products, *available at* https://www.valisure.com/valisure-newsroom/valisure-detects-benzene-in-body-spray-products.

*Grieb v. Church & Dwight Co., Inc.*
CLASS ACTION COMPLAINT

43.     On November 3, 2021, it submitted these findings in a citizen's petition to the FDA.[23]

44.     Valisure's detection of benzene and other carcinogens in these products has been independently confirmed by the industry and led to recalls by manufacturers over the subject products.[24]

45.     For example, Procter & Gamble and Unilever both recalled certain antiperspirant or body spray products.[25]

46.     Also in 2021, Valisure tested aerosol sun care products for benzene. It found benzene in 43 out of 234 sunscreens and in 8 out of 48 after-sun products.[26]

47.     On May 24, 2021, it submitted these findings in a citizen's petition to the FDA.[27]

---

[23] *See* Valisure November 3, 2021 Citizen Petition on Benzene in Body Spray Products, *available at* https://www.valisure.com/valisure-newsroom/valisure-detects-benzene-in-body-spray-products.

[24] *See* Anna Edney, Bloomberg News, Leukemia-causing benzene found in underarm sprays (Nov. 4, 2021) ("Yale University's Chemical and Biophysical Instrumentation Center confirmed the presence of benzene in a sampling of the sprays through separate tests."), *available at* https://medicalxpress.com/news/2021-11-leukemia-causing-benzene-underarm.html.

[25] *See, e.g.*, Bruce Y. Lee, Forbes, FDA: P&G Recalls Antiperspirant Sprays Due To Cancer Risk Of Benzene (Nov. 24, 2021), *available at* https://www.forbes.com/sites/brucelee/2021/11/24/fda-pg-recalls-antiperspirants-body-sprays-due-to-cancer-risk-of-benzene/?sh=69cf13c24f32; *see also* Sandee LaMotte, CNN, Antiperspirant recall: What the finding of a cancer-causing chemical means for you (Dec. 1, 2021), *available at* https://www.cnn.com/2021/12/01/health/deodorants-antiperspirants-recall-benzene-explainer-wellness/index.html.

[26] Valisure, Valisure Detects Benzene in Sunscreen (May 25, 2021), *available at* https://www.valisure.com/valisure-newsroom/valisure-detects-benzene-in-sunscreen.

[27] *See* Valisure May 24, 2021 Citizen Petition on Benzene in Sunscreen and After-sun Care Products (available for download at https://www.valisure.com/valisure-newsroom/valisure-detects-benzene-in-sunscreen).

*Grieb v. Church & Dwight Co., Inc.*
CLASS ACTION COMPLAINT

48.    Again, the results of Valisure's testing were confirmed by additional industry testing and eventual recall of many products Aveeno, Neutrogena, and Coppertone sun care products.[28]

**C.    The Batiste Dry Shampoo Products**

49.    Defendant C&D is a large, sophisticated S&P 500 corporation, with annual revenues over $3 billion, and is in the business of manufacturing, distributing, and selling consumer goods. In addition to owning the Batiste brand, it owns well-known brands such as Arm & Hammer, Oxi Clean, and Trojan.

50.    C&D sells a line of aerosol dry shampoo products under the Batiste brand name. C&D claims that Batiste is an "Award Winning No. 1 Brand" based on unit sales of dry shampoos according to Neilson data.

51.    Dry shampoos are products that absorb the dirt, oil, and grease of your scalp without washing it.

---

[28] *See id.*; *see also* Consumer Reports, Aveeno and Neutrogena Spray Sunscreens Recalled Due to Low Levels of Benzene, a Carcinogen (July 15, 2021), *available at* https://www.consumerreports.org/recalls/aveeno-and-neutrogena-spray-sunscreens-recalled-due-to-low-l-a1023552958/.

52.     Below are true and correct representative pictures of a Batiste Dry Shampoo.





11

53.    The labeling of all Batiste Dry Shampoos at issue here are substantially similar and they all fail to disclose the presence of benzene or the risk of benzene exposure.

54.    Aerosol dry shampoos are applied by spraying the dry shampoo directly into the hair and scalp.

55.    C&D instructs consumers of the Batiste Dry Shampoos on their labels to "spray towards your [hair] roots (from about 12 inches)" and use your fingers to "massage to ensure the roots are covered."

56.    On the label of the Batiste Dry Shampoos, C&D lists as ingredients the aerosol propellants butane, isobutane, and propane.

57.    Benzene is not listed on the Products' labels in any manner, nor is there any warning about the inclusion (or even potential inclusion) of benzene in the Products.

58.    The Batiste Dry Shampoos' labeling also does not disclose or warn of the toxic dangers or carcinogenic effect of benzene during ordinary use.

59.    On the "Ingredient Disclosure" page of its website, C&D claims that "We care about the ingredients in our products and we're committed to providing the information our consumers need to make informed choices. We provide ingredient listings for all our formulated OTC, cosmetic, pet care, and cleaning products, along with information on what each of these ingredients do. If you want to know what's in one of our products simply look for the product below and click to learn more."[29]

60.    The ingredient disclosures on the website for the Batiste Dry Shampoos, however, do not disclose the presence of benzene.[30]

---

[29] *See* Church & Dwight, Ingredient Disclosure, *available at* https://churchdwight.com/ingredient-disclosure/default.aspx.

[30] *See*, *e.g.*, Church & Dwight, Product Ingredient Disclosure Form for Batiste™ Hint of Color Dry Shampoo – Dark*, available at* https://churchdwight.com/ingredient-disclosure/hair-care/42013831-Hint-of-Color-Dry-Shampoo%E2%80%93Dark.aspx.

61.    On the "Products & Packaging" page of its website, C&D represents that "Provides Safe and Effective Products for our Customers."[31]

62.    It also makes numerous other representations as to the safety of its products as seen in the screenshots capture below.[32]

**Provide Safe and Effective Products for Our Consumers and the Environment**



1. Remove 100% of Chemicals of Concern[1] from formulated products by end of 2021 and timely elimination from acquired products.

2. Disclose ingredients on all formulated products completed in 2020.

63.    On the same page it also represents that it has robust quality control and testing products "[t]o reassure our consumer that we make safe and effective products."[33]

**FOUR STEP SAFETY ASSURANCE PROCESS**

To reassure our consumers that we make safe and effective products, we've developed a four-step ingredient and product assurance process:

**1**

INGREDIENT SELECTION

Evaluate the efficacy and safety of each ingredient at its proposed concentration level, using published regulatory lists, including the U.S. Environmental Protection Agency Safer Choice Ingredient list and chemicals of concern as noted by our stakeholders.

**2**

INGREDIENT/FINISHED PRODUCT EVALUATION

Determine potential human exposure and evaluate the safety of proposed ingredients/products under normal use and reasonably foreseeable misuse conditions.

**3**

PRE-MARKET SAFETY CLEARANCE

Develop a pre-market safety dossier on the finished product to ensure that all safety and sustainability criteria are reviewed prior to manufacture and prior to shipment to customers.

**4**

POST-MARKET EVALUATION

Conduct post-market surveillance and gather customer and consumer feedback.

---

[31] *See* Church & Dwight, Products & Packaging, *available at* https://churchdwight.com/responsibility/our-products.aspx.

[32] *Id.*

[33] *Id.*

64.   On the Frequently asked questions page of the Batiste website, Defendant expressly claims that "All the ingredients in Batiste Dry Shampoo have been tested to ensure maximum safety."[34]

**PRODUCT DETAILS**

Are your cans recyclable?

What SKU's come in travel size?

Is Batiste safe?

All the ingredients in Batiste Dry Shampoo have been tested to ensure maximum safety.

**D.   Independent Testing Demonstrates the Products Contain Benzene**

65.   In a citizen's petition to the FDA, dated October 31, 2022, Valisure described how it "tested and detected high levels of benzene in specific batches of certain dry shampoo products," including the Batiste dry shampoo products challenged here.[35]

66.   Valisure tested 148 batches from 34 brands of dry shampoo products and found that 70% contained benzene.

---

[34] Church & Dwight, Batiste FAQs, *available at* https://www.batistehair.com/faqs.

[35] Valisure, Valisure Citizen Petition on Benzene in Dry Shampoo Products [hereafter, "Petition"], *available at* https://www.valisure.com/valisure-newsroom/valisure-detects-benzene-in-dry-shampoo.

*Grieb v. Church & Dwight Co., Inc.*
CLASS ACTION COMPLAINT

67.     Regarding dry shampoos sold by Batiste, Valisure tested 27 samples using gas chromatography mass spectrometry ("GC-MS"),[36] and found that 24 of those samples—89%—contained more than .18 ppm of benzene.[37]

68.     The results of the first spray testing for the challenged Products using GC-MS testing are listed in the table below:

| Batiste Product | Benzene Concentration (ppm) |
| --- | --- |
| Dry Shampoo Bare - 4.23 fl. oz. | 14.9 |
| Dry Shampoo Bare - 4.23 fl. oz. | 2.61 |
| Dry Shampoo Clean & Light Bare - 6.73 fl. oz. | 3.3 |
| Dry Shampoo Plus Brilliant Blonde - 6.73 fl. oz. | 1.7 |
| Dry Shampoo Floral & Flirty Blush - 1.6 fl. oz. | 1.47 |
| Dry Shampoo Bare - 4.23 oz | 0.73 |
| Dry Shampoo Fresh Breezy Citrus - 4.23 oz | 1.94 |
| Dry Shampoo Plus Divine Dark - 6.73 fl. oz. | 1.81 |
| Dry Shampoo Floral & Flirty Blush - 6.73 fl. oz. | 1.33 |
| Dry Shampoo Plus Divine Dark - 6.73 fl. oz. | 1.2 |
| Dry Shampoo & a Hint of Color for Dark Hair - 6.73 fl. oz. | 1.11 |
| Dry Shampoo Dark Hair - 6.35 oz | 1.09 |

[36] These results were based on results of tests utilizing "industry standard gas chromatography and detection by mass spectrometry ("GC-MS") instrumentation that allows mass spectral separation and utilizing selected ion chromatograms, along with other orthogonal approaches for confirmation of a few select products including high performance liquid chromatography ("HPLC") with UV detection." Petition at 6.

[37] For the purposes of testing, Valisure set a lower limit of quantification ("LLOQ") at the equivalent of 0.18 ppm in dry shampoo products. Petition at 11. While three of the 27 samples tested below the LLOQ, the results do not indicate that those three samples were free of all benzene. *See id.* ("For the data presented in this petition, Valisure is using the nomenclature that any benzene detection of 0.18 ppm or above is "significantly detected," and any detection below this value or lack of benzene detection is described as "< LLOQ.").

| Dry Shampoo Original Classic Clean - 4.23 fl. oz. | 0.79 |
| Dry Shampoo Clean & Classic Original - 6.73 fl. oz. | 0.7 |
| Dry Shampoo Clean & Light Bar - 6.73 fl. oz. | 0.64 |
| Dry Shampoo Plus Divine Dark - 1.6 fl. oz. | 0.54 |
| Dry Shampoo Light & Breezy Fresh - 6.73 fl. oz. | 0.51 |
| Dry Shampoo Floral & Flirty Blush - 1.6 fl. oz. | 0.46 |
| Dry Shampoo Floral & Flirty Blush - 1.6 fl. oz. | 0.3 |
| Dry Shampoo Original Classic Fresh - 6.35 oz | 0.2 |
| Dry Shampoo Tropical Exotic Coconut - 1.06 oz | 0.2 |

69.    While Valisure's GC-MS analysis shows the Batiste dry shampoo products challenged here contain substantial amounts of benzene, in its Petition Valisure explained that these numbers may significantly underestimate the amount of benzene in the Products.

70.    According to Valisure:

Although GC-MS is an industry standard approach and was utilized by Valisure in this Petition, the *sample preparation required in GC-MS analysis may allow some benzene to escape detection* and, therefore, potentially underestimate the amount of contamination. By contrast, SIFT-MS does not require sample preparation, thereby enabling real-time quantitative analysis of dry shampoo spray directly, allowing the investigation of real-world conditions and the potential risks consumers are exposed to with these kinds of contaminated products.[38]

---

[38] Valisure, Petition at 9.

*Grieb v. Church & Dwight Co., Inc.*
CLASS ACTION COMPLAINT

71.   Notably, "[t]he SIFT-MS direct analysis system that eliminates sample prep appears to detect benzene in these aerosol products at approximately 10 – 50 times higher concentrations"[39] than that of the GC-MS analysis.

72.   Using the SIFT-MS method "the calculated concentration of benzene contained in the first spray using the SIFT-MS results was 67 ppm" for Batiste.[40]

73.   Valisure's Petition summarized the testing results for the Batiste Dry Shampoo products in Table 8 of the Petition, seen below.

Table 8. Comparison of benzene concentrations detected on the first spray by SIFT-MS and four subsequent sprays by GC-MS of the same bottles of two brands described in Table 7. Summary results of first spray analyses of the same brands also provided.

| | First Spray SIFT-MS Benzene (ppm) | Subsequent Sprays GC-MS Benzene (average ppm) | GC-MS Brand Average First Spray Benzene (ppm) | Relative Standard Deviation (RSD) | GC-MS Analyzed Bottles |
|---|---|---|---|---|---|
| Batiste | 67 | 1.37 | 1.45 | 193% | 27 |
| NYM | 340 | 20.11 | 35.31 | 137% | 26 |

74.   In short, Valisure's GC-MS testing demonstrates that the Batiste Dry Shampoos contain significant amounts of benzene and its SIFT-MS analysis of benzene (by directly sampling contaminated air after spraying dry shampoo products), suggests potential for short- and long-term inhalation exposure to high levels of benzene.

**E.    Defendant's Knowledge, Misrepresentations, Omissions, and Concealment of Material Facts Deceived Plaintiff and Reasonable Consumers**

75.   As a manufacturer of aerosol products and given the highly publicized and recent reporting and recalls of aerosol products for containing benzene, C&D knew or should have known that there was a risk of the Dry Shampoos containing benzene.

76.   Defendant sold dry shampoo products containing butane propellants during the class period despite Defendant's knowledge of the risk of benzene contamination.

---

[39] *Id.* at 21.

[40] *Id.* at 20; *see also id.* at 21 (Table 8).

77.     Defendant, a large, sophisticated corporation in the business of manufacturing, distributing, and selling products containing aerosol propellants such as butane, knew or should have known of the risks of benzene contamination.

78.     Defendant's use of butane as a propellant therefore put them on notice of the risk of benzene contamination in the Products.

79.     Defendant sold dry shampoo products containing butane during the class period despite Defendant's knowledge of the risk of benzene contamination.

80.     Benzene is not listed on the Products' labels in any manner, nor is there any warning about the inclusion (or even potential inclusion) of benzene in the Products.

81.     Defendant had and has a duty to ensure that its Products did not and do not contain benzene, including through regular testing, especially before the Products injecting into the stream of commerce for consumers to use on their bodies. But based on Valisure's testing results set forth above, Defendant made no reasonable effort to test its Products for benzene.

82.     Defendant could have avoided any potential for benzene contamination in the Products by changing the manufacturing process or raw ingredients, and the Products could have been sold with absolutely no benzene in them.

83.     Defendant could have avoided exposing Plaintiff and the Class to benzene, and the Products could have been sold with absolutely no benzene in them.

84.     As described above Defendant made assurances regarding the safety and quality of its Products without disclosing to consumers that its Products contain cancer-causing benzene.

85.     Additionally, although the Products were found to contain benzene, Defendant does not list benzene among the ingredients anywhere on its website, and nothing on the Products' labels otherwise insinuate, state, or warn that the Products contain benzene. Benzene, unlike the volatile hydrocarbons butane, isobutane, and propane, is not listed as an ingredient. Again, such misrepresentations and or omissions mislead consumers regarding the safety and quality of the Products.

*Grieb v. Church & Dwight Co., Inc.*
CLASS ACTION COMPLAINT

86.    The presence of benzene in the Products renders the Products misbranded and adulterated and therefore illegal and unfit for sale in trade or commerce. Plaintiff would not have purchased the Products had they been truthfully and accurately labeled.

87.    If Defendant had not disregarded the FDA's cGMPs, or had fulfilled their quality assurance obligations, Defendant would have identified the presence of the benzene through routine and required testing.

88.    Further, had Defendant adequately tested its Products for benzene and other carcinogens and impurities, it would have discovered that its Products contained benzene.

89.    Defendant also knew or should have known about the carcinogenic potential of benzene because it is classified as a Group 1 compound by the World Health Organization and the International Agency for Research on Cancer, meaning that it is carcinogenic to humans.

90.    Yet, Defendant failed to implement adequate testing protocols or adequately warn consumers of the risk. Such testing would have detected benzene.

91.    Defendant knowingly, recklessly, or at least negligently, introduced contaminated, adulterated, and misbranded Products containing or at risk for containing dangerous amounts of benzene into the U.S. market, including California.

92.    By marketing and selling its dry shampoo products in the stream of commerce with the intent that its Products would be purchased by Plaintiff and Class Members, Defendant warranted that the Products are safe to use rather than adulterated and misbranded dry shampoos containing a dangerous, cancer-causing chemical.

93.    Defendant did not disclose the actual or potential presence of benzene in its Batiste Dry Shampoos on in labeling, advertising, marketing.

94.    Defendant's concealment was material and intentional because people are concerned with what is in the Products that they are putting onto and into their bodies. Consumers such as Plaintiff and Class members make purchasing decisions based on the representations made on the Product's labeling, including the ingredients listed.

*Grieb v. Church & Dwight Co., Inc.*
CLASS ACTION COMPLAINT

95. Defendant knows that if it had not omitted that the Products contained benzene and or had properly warned them, then Plaintiff and Class members would not have purchased the Products.

## III. THE PRODUCTS ARE ADULTERATED AND MISBRANDED

96. The California's Sherman Law and the Federal Food, Drug, and Cosmetic Act ("FDCA") define cosmetics as articles "intended to be rubbed, poured, sprinkled, or sprayed on, introduced into, or otherwise applied to the human body . . . for cleansing, beautifying, promoting attractiveness, or altering the appearance." *See* Cal. Health & Safety Code § 109900; 21 U.S.C. § 201(i). Cleansing shampoos, like the Products, are defined as cosmetics.

97. "Adulteration" refers to violations involving product composition—whether they result from ingredients, contaminants, processing, packaging, or shipping and handling. Under the California law and the FDCA, a cosmetic is adulterated if, among other things it contains any poisonous or deleterious substance which may render it injurious to users under the conditions of use prescribed in the labeling or under conditions of use as are customary and usual. *See* Cal. Health & Safety Code § 111670; 21 U.S.C. § 361.

98. The Products are adulterated because they contain benzene, which is a poisonous or deleterious substance which may render the Products injurious to users under the conditions of use prescribed in the labeling thereof, or under conditions of use as are customary and usual.

99. "Misbranding" refers to violations involving improperly labeled or deceptively packaged products. Under the California law and the FDCA, a cosmetic is misbranded if, among other things:

        a.    its labeling is "false or misleading in any particular";

        b.    its label does not include an accurate statement of the quantity of the contents in terms of weight, measure, or numerical count;

        c.    the required information is not adequately prominent and conspicuous; or

        d.    "its container is so made, formed, or filled as to be misleading."

*See* Cal. Health & Safety Code §§ 111730-50; 21 U.S.C § 362.

100.   A product also may be misbranded due to failure to provide material facts. This means, for example, any directions for safe use and warning statements needed to ensure a product's safe use. *See* 21 U.S.C. 321(n) ("If an article is alleged to be misbranded because the labeling or advertising is misleading, then in determining whether the labeling or advertising is misleading there shall be taken into account (among other things) not only representations made or suggested by statement, word, design, device, or any combination thereof, but also the extent to which the labeling or advertising fails to reveal facts material in the light of such representations or material with respect to consequences which may result from the use of the article to which the labeling or advertising relates under the conditions of use prescribed in the labeling or advertising thereof or under such conditions of use as are customary or usual").

101.   In addition, manufacturers are required to list all ingredients for cosmetics marketed on a retail basis to consumers and cosmetics that fail to comply with this requirement are considered misbranded. *See* 21 C.F.R. § 701.3; Cal. Health & Safety Code, § 111740.

102.   In addition, if the safety of a cosmetic is not adequately substantiated, the product may be considered misbranded and may be subject to regulatory action unless the label bears the following statement: "Warning--The safety of this product has not been determined." *See* 21 C.F.R. § 740.10.

103.   All cosmetic products and ingredients are subject to the same safety requirement under the FD&C Act: They must be safe for consumers under labeled or customary conditions of use.

104.   The Products are misbranded because their labeling is "false" and "misleading" because it does not disclose the presence of benzene, including in the ingredient list.

105.   The Products are misbranded because their labeling is "false" and "misleading" because it does not disclose that the Products may contain benzene.

106.   The Products are misbranded because their labeling is "false" and "misleading" because it does not disclose the risks resulting from exposure to benzene.

21

107.   The Products are misbranded because they fail to provide adequate directions for safe use and warning statements needed to ensure a product's safe use.

108.   The Products are misbranded because their safety has not been adequately substantiated, for example by verifying no benzene is present through testing, and the label does not bear the following statement: "Warning--The safety of this product has not been determined."

109.   The Products are misbranded because Defendant "fail[ed] to reveal facts that are material in light of other representations made or suggested by the statement[s], word[s], design[s], device[s], or any combination thereof," in violation of 21 C.F.R. § 1.21(a)(1).

110.   The Products are misbranded because Defendant to reveal facts that were "[m]aterial with respect to the consequences which may result from use of the article under" both "[t]he conditions prescribed in such labeling," and "such conditions of use as are customary or usual," in violation of § 1.21(a)(2).

111.   California law and the FDCA both prohibit the marketing of "adulterated" or "misbranded" cosmetics and "adulterated" or "misbranded" products cannot legally be manufactured, advertised, distributed, or sold. *See, e.g.*, Cal. Health & Safety Code §111765 ("It is unlawful for any person to manufacture, or sell any cosmetic that is misbranded."); *id*. § 111700 ("It is unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any cosmetic that is adulterated."); 21 U.S.C. § 331(a) (prohibiting the "introduction into interstate commerce of any . . . cosmetic that is adulterated or misbranded.").

112.   Adulterated and misbranded products thus have no economic value and are legally worthless.

**IV.   PLAINTIFF'S PURCHASE, RELIANCE, AND INJURY**

113.   As best she can recall, Ms. Grieb purchased the Batiste Dry Shampoo Bare, in the 4.23 fl. oz. size cans during the Class Period. She recalls making some of her purchases at store such as the Target located in Plaza Bonita, in National City, California.

114.   When purchasing the Batiste Dry Shampoo products, Ms. Grieb was seeking a benzene dry shampoo that was safe to use and did not contain any toxic or carcinogenic

components like benzene. In purchasing the Batiste Dry Shampoo Bare, she was exposed to, read, and relied on C&D's representations regarding the contents of the Products, including the ingredient list. Based on the Batiste Dry Shampoo Bare label, Ms. Grieb reasonably believed that it was safe for its intended use and that it did not contain toxic or carcinogenic components like benzene.

115.   Had Ms. Grieb know the truth, that the Products contained benzene (or even there was an undetermined risk that they contained benzene) she would not have purchased Batiste Dry Shampoos.

116.   Ms. Grieb and consumers at large have become increasingly concerned about the effects of harmful chemical ingredients in products that they and their family members put on and/or into their bodies.

117.   Companies such as Defendant have capitalized on consumers' desire for safe products, and indeed, consumers are willing to pay, and have paid, a premium for these products.

118.   When Plaintiff purchased Defendant's Products, Plaintiff did not know, and had no reason to know, that Defendant's Products contained or risked containing the harmful carcinogen benzene. Not only would Plaintiff not have purchased Defendant's Products had she known the Products contained benzene (or even that there was a risk they contained benzene), but she would also not have been capable of purchasing them if Defendant had done as the law required and tested the Products for benzene and other carcinogens and impurities.

119.   Consumers lack the ability to test or independently ascertain or verify whether a product contains unsafe substances, such as benzene, especially at the point of sale, and therefore must and rely on Defendant to truthfully and honestly report what the Products contain on the Products' packaging or labels and the safety risks of using the Products.

120.   Further, given Defendant's position in the cosmetic market as an industry leader, Plaintiff and reasonable consumers, trusted and relied on Defendant's representations and omissions regarding the presence of benzene in the Products.

23

121.   Yet, when consumers look at the Products' packaging, there is no mention of benzene. It is not listed in the ingredients section, nor is there any warning about the inclusion (or even potential inclusion) of benzene in the Products. This leads reasonable consumers to believe the Products do not contain benzene. Indeed, these expectations are reasonable because if the Products are properly manufactured and tested, benzene will not be present in the Products.

122.   No reasonable consumer would have paid any amount for products containing benzene, a known carcinogen and toxin. Thus, if Plaintiff and Class members had been informed that Defendant's Products contained or may contain benzene, they would not have purchased or used the Products, or would have paid significantly less for the Products, making such omitted facts material to them.

123.   Defendant's unlawful, unfair, and fraudulent omissions and deceptive misrepresentations regarding the presence of benzene in the Products are likely to continue to deceive and mislead reasonable consumers and the public.

124.   Plaintiff and Class members bargained for dry shampoo products that had no risk of containing dangerous substances but the Products Plaintiff and Class members received either contained benzene or were at significant risk of containing benzene.

125.   Plaintiff and Class members were injured by the full purchase price of the Products because the Products are worthless, as they are adulterated and contain harmful levels of benzene (or at risk of containing the same) and Defendant failed to warn consumers of this fact. Such illegally sold products are worthless and have no value.

126.   If Defendant had disclosed to Plaintiff and putative Class Members that the Products contained benzene or risked containing benzene and thus users risked exposure to benzene, Plaintiff and Class Members would not have purchased the Products or they would have only been willing to pay less for the Products.

127.   Defendant engaged in fraudulent, unfair, deceptive, misleading, and/or unlawful conduct stemming from its misrepresentations and omissions surrounding benzene in Products.

128.   Plaintiff paid more for the Products, and would only have been willing to pay less, or unwilling to purchase them at all, absent the false and misleading labeling complained of herein.

129.   Plaintiff would not have purchased the Products if they had known that the Products were adulterated or misbranded pursuant to California and federal law.

130.   Plaintiff still wishes to purchase safe dry shampoo products that do not have and are not at risk of containing benzene. She continues to see the Products at stores where she shops. Plaintiff would purchase Products in the future if the Products were as represented, but unless Defendant is enjoined in the manner Plaintiff requests, she will not be able to rely on Defendant's claims in the future.

131.   Plaintiff would purchase the Products if she could trust that the Products' representations were true, and not false or misleading, but absent an injunction, Plaintiff will be unable to trust the that the labeling is accurate and not misleading when Plaintiff encounters them in the marketplace.

132.   Plaintiff's substantive right to a marketplace free of fraud, where she is entitled to rely with confidence on representations such as those made by Defendant, continues to be violated every time Plaintiff is exposed to the Products' labeling.

133.   Plaintiff's legal remedies are inadequate to prevent these future injuries.

## CLASS ACTION ALLEGATIONS

134.   While reserving the right to redefine or amend the class definition prior to or as part of a motion seeking class certification, pursuant to Federal Rule of Civil Procedure 23, Plaintiff seeks to represent a class of all persons in the United States, and a subclass of all persons in California, who, at any time from four years preceding the date of the filing of this Complaint to the time a class is notified (the "Class Period"), purchased, for personal or household use, and not for resale or distribution, any of the Products (the "Class").

135.   The members in the proposed Class, and the subclass, are so numerous that individual joinder of all members is impracticable, and the disposition of the claims of all Class Members in a single action will provide substantial benefits to the parties and Court.

136.    Questions of law and fact common to Plaintiff and the Class include:

      a.    whether the Products are misbranded or adulterated;

      b.    whether Defendant's conduct violates state or federal statutes or regulations regarding cosmetics;

      c.    whether a reasonable consumer would consider the presence of benzene in the Products to be material;

      d.    whether Defendant knew or should have known that the Products contain benzene;

      e.    whether the labeling of the Products is misleading to the reasonable consumer;

      f.    whether Defendant's conduct is unfair;

      g.    whether Defendant was unjustly enriched;

      h.    whether Defendant made and breached warranties to the Class;

      i.    the proper amount of damages;

      j.    the proper amount of restitution;

      k.    the proper scope of injunctive relief; and

      l.    the proper amount of attorneys' fees.

137.    These common questions of law and fact predominate over questions that affect only individual Class Members.

138.    Plaintiff's claims are typical of Class Members' claims because they are based on the same underlying facts, events, and circumstances relating to Defendant's conduct. Specifically, all Class Members, including Plaintiff, were subjected to the same unlawful and deceptive conduct when they purchased the Products and suffered economic injury because they were unlawfully and deceptively sold. Absent Defendant's business practice of deceptively and unlawfully labeling the Products, Plaintiff and Class Members would not have purchased them or would have paid less for them.

139.   Plaintiff will fairly and adequately represent and protect the interests of the Class, has no interests incompatible with the interests of the Class, and has retained counsel competent and experienced in class action litigation.

140.   Class treatment is superior to other options for resolution of the controversy because the relief sought for each Class Member is small, such that, absent representative litigation, it would be infeasible for Class Members to redress the wrongs done to them.

141.   Defendant has acted on grounds applicable to the Class, thereby making appropriate final injunctive and declaratory relief concerning the Class as a whole.

142.   As a result of the foregoing, class treatment is appropriate under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3).

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Violations of the Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.***
**(On Behalf of the California Subclass)**

143.   Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth fully herein.

144.   The UCL prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

145.   The acts, omissions, misrepresentations, practices, and non-disclosures of as alleged herein constitute business acts and practices.

### Fraudulent

146.   A statement or practice is fraudulent under the UCL if it is likely to deceive a significant portion of the public, applying an objective reasonable consumer test.

147.   As set forth herein, Defendant's labeling practice of failing to disclose the presence of benzene and risk of benzene exposure on the label is likely to deceive reasonable consumers and the public as to the safety of the Products.

148.   Defendant has engaged in conduct that is likely to deceive members of the public. This conduct includes representing on its Products' labels that its Products contain

*Grieb v. Church & Dwight Co., Inc.*
CLASS ACTION COMPLAINT

only the ingredients listed in the labels, which is untrue, and failing to make any mention that the Products contain benzene or may contain benzene, a known human carcinogen, and the risks of benzene exposure.

149.    Defendant's labeling and advertisements contain untrue and materially misleading statements and omissions concerning its Products inasmuch as they misrepresent that the Products are safe for use and don't list that the Products contain benzene.

### **Unlawful**

150.    The acts alleged herein are "unlawful" under the UCL in that they violate at least the following laws:

- The False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq.*;

- The Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.*;

- The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301 *et seq.*; and

- The California Sherman Food, Drug, and Cosmetic Law, Cal. Health & Safety Code §§ 110100 *et seq.*

### **Unfair**

151.    Defendant's conduct with respect to the manufacture, testing, labeling, advertising, and sale of the Products was and is unfair because Defendant's conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers, and the utility of its conduct, if any, does not outweigh the gravity of the harm to its victims.

152.    Defendant's conduct with respect to the manufacture, testing, labeling, advertising, and sale of the Products was and is unfair because it violates public policy as declared by specific constitutional, statutory or regulatory provisions, including but not necessarily limited to the False Advertising Law, portions of the Federal Food, Drug, and Cosmetic Act, and portions of the California Sherman Food, Drug, and Cosmetic Law.

153.    Defendant's conduct with respect to the manufacture, testing, labeling, advertising, and sale of the Products was and is unfair because the consumer injury was substantial, not outweighed by benefits to consumers or competition, and not one consumers themselves could reasonably have avoided.

154. Specifically, the increase in profits obtained by Defendant through the misleading labeling does not outweigh the harm to Class Members who were deceived into purchasing the Products believing they were safe.

155. Defendant profited from the sale of the unfairly, deceptively, and unlawfully marketed and sold Products to unwary consumers.

156. Plaintiff and Class Members are likely to continue to be damaged by Defendant's unfair, deceptive, and unlawful trade practices, because Defendant continues to disseminate misleading information. Thus, injunctive relief enjoining Defendant's deceptive practices is proper.

157. Defendant's conduct caused and continues to cause substantial injury to Plaintiff and other Class Members. Plaintiff has suffered injury in fact as a result of Defendant's unfair, unlawful, and fraudulent conduct.

158. In accordance with Bus. & Prof. Code § 17203, Plaintiff seeks an order enjoining Defendant from continuing to conduct business through unlawful, unfair, and fraudulent acts and practices.

159. Plaintiff and the Class also seek an order for the restitution of all monies from the sale of the Products, which were unjustly acquired through acts of unfair, unlawful, and deceptive competition.

160. Because Plaintiff's claims under the unlawful and unfair prongs of the UCL sweep more broadly than her claims under the FAL, CLRA, or UCL's "fraudulent" prong, her legal remedies are inadequate to fully compensate her for all of Defendant's challenged behavior.

161. Moreover, because the Court has broad discretion to award restitution under the UCL and could, when assessing restitution under the UCL, apply a standard different than that applied to assessing damages under the CLRA or commercial code, and restitution is not limited to returning to Plaintiff and California Class Members monies in which they have an interest, but more broadly serves to deter the offender and others from future violations, the

*Grieb v. Church & Dwight Co., Inc.*
CLASS ACTION COMPLAINT

legal remedies available under the CLRA and commercial code are more limited than the equitable remedies available under the UCL, and are therefore inadequate.

162.   Finally, because the procedures for obtaining relief under the UCL are more efficient than under the CLRA or commercial code, Plaintiff's legal remedies are inadequate.

## SECOND CAUSE OF ACTION

### Violations of the False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq.*

### (On Behalf of the California Subclass)

163.   Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth fully herein.

164.   The False Advertising Law (FAL) provides that "[i]t is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services" to disseminate any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500. It is also unlawful under the FAL to disseminate statements concerning property or services that are "untrue or misleading, and which [are] known, or which by the exercise of reasonable care should be known, to be untrue or misleading." *Id*.

165.   As alleged herein, the advertisements, labeling, policies, acts, and practices of Defendant relating to the Products were likely to mislead consumers acting reasonably, as to the content of the Products and the potential risk of exposure to benzene.

166.   Plaintiff suffered injury in fact as a result of Defendant's actions as set forth herein because she purchased the Products in reliance on Defendant's false and misleading marketing claims stating or suggesting that the Products are free from benzene and are safe for their ordinary use.

167.   Defendant's business practices as alleged herein constitute deceptive, untrue, and misleading advertising pursuant to the FAL because Defendant has advertised the Products in a manner that is untrue and misleading, which Defendant knew or reasonably should have known, and omitted material information from the Products' labeling.

168.   Defendant profited from the sale of the falsely and deceptively advertised the Products to unwary consumers.

169.   As a result, Plaintiff and California Class, and the general public are entitled to injunctive and equitable relief, restitution, and an order for the disgorgement of the funds by which Defendant was unjustly enriched.

170.   Pursuant to Cal. Bus. & Prof. Code § 17535, Plaintiff, on behalf of herself and the Class, seeks an order enjoining Defendant from continuing to engage in deceptive business practices, false advertising, and any other act prohibited by law, including those set forth in this Complaint.

171.   Because the Court has broad discretion to award restitution under the FAL and could, when assessing restitution under the FAL, apply a standard different than that applied to assessing damages under the CLRA or commercial code, and restitution is not limited to returning to Plaintiff and Class Members monies in which they have an interest, but more broadly serves to deter the offender and others from future violations, the legal remedies available under the CLRA and commercial code are more limited than the equitable remedies available under the FAL, and are therefore inadequate.

172.   In addition, because the procedures for obtaining relief under the FAL are more efficient than under the CLRA or commercial code, Plaintiff's legal remedies are inadequate.

### THIRD CAUSE OF ACTION

### Violations of the Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.*
### (On behalf of the California Subclass)

173.   Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth fully herein.

174.   The CLRA prohibits deceptive practices in connection with the conduct of a business that provides goods, property, or services primarily for personal, family, or household purposes.

175.   Defendant's false and misleading labeling and other policies, acts, and practices were designed to, and did, induce the purchase and use of the Products for personal, family,

or household purposes by Plaintiff and Class Members, and violated and continue to violate the following sections of the CLRA:

a.    § 1770(a)(5): representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have

b.    § 1770(a)(7): representing that goods are of a particular standard, quality, or grade if they are of another;

c.    § 1770(a)(9): advertising goods with intent not to sell them as advertised; and

d.    § 1770(a)(16): representing the subject of a transaction has been supplied in accordance with a previous representation when it has not.

176.    Defendant profited from the sale of the falsely, deceptively, and unlawfully advertised Products to unwary consumers.

177.    Defendant's wrongful business practices constituted, and constitute, a continuing course of conduct in violation of the CLRA.

178.    Plaintiff and the Class have suffered harm and seek only injunctive relief and restitution, at this time.

179.    In compliance with Cal. Civ. Code § 1780(d), an affidavit of venue is filed concurrently herewith.

## FOURTH CAUSE OF ACTION

### Breaches of Express Warranties, Cal. Com. Code § 2313(1)

### (On behalf of the California Subclass)

180.    California Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth fully herein.

181.    Through the Products' labeling, Defendant made affirmations of fact or promises, or description of goods, that, *inter alia*, the Products do not contain benzene and are safe for their ordinary use.

32

182.   These affirmations and descriptions include the ingredient list which lists butane, isobutane, propane, as propellants, but fails to disclose the presence of benzene.

183.   These representations made through the ingredient list were "part of the basis of the bargain," in that Plaintiff and the Class purchased the Products in reasonable reliance on those statements. Cal. Com. Code § 2313(1).

184.   Defendant breached its express warranties by selling Products that contain benzene or at risk for containing benzene and fails to adequately warn of safety risks.

185.   At the time that Defendant marketed and sold its Products, it recognized the purposes for which the products would be used, and expressly warranted the products were suitable for human application and not adulterated or misbranded. These affirmative representations became part of the basis of the bargain in every purchase by Plaintiff and the Class.

186.   Defendant's breach actually and proximately caused injury in the form of the lost purchase price that Plaintiff and Class Members paid for the Products.

187.   As a result, Plaintiff seeks, on behalf of herself and other Class Members, actual damages resulting from Defendant's breaches of express warranty, including, without limitation, expectation damages.

## FIFTH CAUSE OF ACTION

### Breach of Implied Warranty of Merchantability, Cal. Com. Code § 2314
### (On behalf of the California Subclass)

188.   Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth fully herein.

189.   Defendant is a merchant with respect to the goods of this kind which were sold to Plaintiff and the Class, and there were, in the sale to Plaintiff and the Class, implied warranties that those goods were merchantable.

190.   Defendant further impliedly warranted that the Products were fit for the particular purposes for which they were intended and sold. At the time Defendant marketed and otherwise placed its Products into the stream of commerce, it knew of the particular

purpose for which Plaintiff and the Class members purchased the Products—to have a safe and effective dry shampoo—which did not contain any dangerous carcinogens. Defendant also knew that consumers, including Plaintiff and members of the Class, would have no ability or opportunity to determine the ingredients in the Products, but instead would rely on Defendant's representations that the Products were suitable for their particular purpose and free of dangerous carcinogens (i.e., benzene).

191.   Defendant warranted that its Products were fit for their ordinary use (i.e., as a safe product suitable for human application).

192.   As alleged, the Products were not adequately labeled and did not disclose that they contain benzene.

193.   Because the Products contain benzene, they were not of the same quality as those generally acceptable in the trade and were not fit for the ordinary purposes for which such Products are used.

194.   Defendant's Products were not suitable for human application due to their benzene content.

195.   Accordingly, the Products are not merchantable and Defendant breached that implied warranty of merchantability.

196.   As an actual and proximate result of Defendant's conduct, Plaintiff and the Class did not receive goods as impliedly warranted by Defendant to be merchantable.

197.   Defendant's breach actually and proximately caused injury in the form of the lost purchase price that Plaintiff and Class Members paid for the Products.

198.   As a result, Plaintiff seek actual damages, including, without limitation, expectation damages.

## SIXTH CAUSE OF ACTION

### Negligent Misrepresentation

199.   Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if fully set forth herein.

200.   As alleged above, Defendant misrepresented the health and safety of their Products and omitted that the Products contained, or were at risk of containing, benzene. These misrepresentations and omissions constituted a material fact in that a consumer's decision to purchase one of the Products would be influenced by its health and safety and the presence of benzene or even the risk of benzene being present.

201.   Defendant's misrepresentations and omissions were made in the course of business transactions (the marketing, advertisement, sale, and purchase of the Products) in which both Plaintiff and Defendant have a pecuniary interest.

202.   Defendant knew or should have known that these representations and omissions were false or misleading and it failed to exercise reasonable care in dissemination of the information contained on its labels and in its marketing and advertising.

203.   Defendant possesses superior knowledge regarding the risks involved in the production and manufacturing of their Products. Such knowledge is not readily available to consumers like Plaintiff and Class Members.

204.   Defendant has a duty to provide consumers, like Plaintiff and Class Members, with safe products and a duty to provide adequate warnings for safety risks related to products.

205.   Consumers lack the meaningful ability to test or independently ascertain or verify whether a product contains unsafe substances, such as benzene, especially at the point of sale, and therefore must and do rely on Defendant to truthfully and honestly report what the Products contain (or are at risk of containing) on the Products' packaging and/or labeling.

206.   Defendant intended that its representations and omissions would induce consumers like Plaintiff and Class Members into purchasing the Products.

207.   Plaintiff's injuries were proximately caused by Defendant's misrepresentations and omissions. Plaintiff viewed Defendant's labels prior to purchasing the Products, and the representations and omissions prompted her to purchase the Products. Had Plaintiff been aware of Defendant's misrepresentations and omissions, she would have been unwilling to purchase the Products, or to purchase them at the price that she paid.

208.  Defendant marketed the Products in a manner conveying to reasonable consumers that the Products are safe for ordinary use and do not contain benzene.

209.  Defendant's misrepresentations regarding the Products are material to a reasonable consumer because they relate to human health and reasonable consumers would attach importance to such representations and omissions and these would influence their purchasing decision.

210.  In selling the Products, Defendant acted in the ordinary course of its business and had a pecuniary interest in Plaintiff and Class Members purchasing the Products.

211.  Defendant owed a duty of care to Plaintiff, not to provide them false or incomplete information when they were making their purchase decisions regarding the Products.

212.  Defendant intends that Plaintiff and other consumers rely on its labeling and safety representations.

213.  Plaintiff and Class Members have reasonably and justifiably relied on Defendant's misrepresentations when purchasing the Products, and had the correct facts been known, would not have purchased them or at least not at the prices at which they were offered.

214.  Therefore, as a direct and proximate result of Defendant's negligent misrepresentations, Plaintiff and Class Members have suffered economic losses and other general and specific damages, in the amount of the Products' purchase prices, or some portion thereof, and any interest that would have accrued on those monies, all in an amount to be proven at trial.

## SEVENTH CAUSE OF ACTION

### Intentional Misrepresentation

215.  Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth in full herein.

216.  Defendant marketed the Products in a manner conveying to reasonable consumers that the Products do not contain benzene and are safe for use. Therefore, Defendant has made misrepresentations about the Products.

217.   Defendant's misrepresentations regarding the Products are material to a reasonable consumer because they relate to human health. A reasonable consumer would attach importance to such representations and would be induced to act thereon in making purchase decisions.

218.   At all relevant times, Defendant knew that the misrepresentations were misleading, or has acted recklessly in making the misrepresentations, without regard to their truth.

219.   Defendant intended and intends that Plaintiff and other consumers rely on these misrepresentations on the Products' packaging.

220.   Plaintiff and the Class have reasonably and justifiably relied on Defendant's intentional misrepresentations, which are illegal and prohibited, when purchasing the Products; had the correct facts been known, they would not have purchased the Products, or at least at the prices at which the Products were offered.

221.   Therefore, as a direct and proximate result of Defendant's intentional misrepresentations, Plaintiff and Class Members have suffered economic losses and other general and specific damages, in the amount of the Products' purchase prices, or some portion thereof, and any interest that would have accrued on those monies, all in an amount to be proven at trial.

### EIGHTH CAUSE OF ACTION

### Unjust Enrichment

222.   Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if fully set forth herein.

223.   Plaintiff and Class Members conferred upon Defendant an economic benefit, in the form of profits resulting from the purchase and sale of the Products.

224.   Defendant's financial benefits resulting from its unlawful and inequitable conduct are economically traceable to Plaintiff's and Class Members' purchases of the Products and the economic benefits conferred on Defendant are a direct and proximate result of its unlawful and inequitable conduct.

225.   It would be inequitable, unconscionable, and unjust for Defendant to be permitted to retain these economic benefits because the benefits were procured as a direct and proximate result of its wrongful conduct.

226.   As a result, Plaintiff and Class Members are entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits which may have been obtained by Defendant as a result of such business practices.

## **PRAYER FOR RELIEF**

227.   Wherefore, Plaintiff, on behalf of herself, all others similarly situated, and the general public, pray for judgment against Defendant as to each and every cause of action, and the following remedies:

a.   An Order declaring this action to be a proper class action, appointing Plaintiff as Class Representative, and appointing Plaintiff's undersigned counsel as Class Counsel;

b.   An Order requiring Defendant to bear the cost of Class Notice;

c.   An Order compelling Defendant to destroy all misleading and deceptive advertising materials and product labels, and to recall all offending products;

d.   An Order requiring Defendant to disgorge all monies, revenues, and profits obtained by means of any wrongful act or practice;

e.   An Order requiring Defendant to pay restitution to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent business act or practice, or untrue or misleading advertising, plus pre-and post-judgment interest thereon;

f.   An Order requiring Defendant to pay compensatory damages and punitive damages as permitted by law;

g.   An award of attorneys' fees and costs; and

h.   Any other and further relief that Court deems necessary, just, or proper.

## **JURY DEMAND**

228.   Plaintiff hereby demands a trial by jury on all issues so triable.

*Grieb v. Church & Dwight Co., Inc.*
CLASS ACTION COMPLAINT

Dated: November 14, 2022                    /s/ Paul Joseph

**FITZGERALD JOSEPH LLP**
JACK FITZGERALD
*jack@fitzgeraldjoseph.com*
PAUL K. JOSEPH
*paul@fitzgeraldjoseph.com*
MELANIE PERSINGER
*melanie@fitzgeraldjoseph.com*
TREVOR M. FLYNN
*trevor@fitzgeraldjoseph.com*
CAROLINE S. EMHARDT
*caroline@fitzgeraldjoseph.com*
2341 Jefferson Street, Suite 200
San Diego, California 92110
Phone: (619) 215-1741

***Counsel for Plaintiff***

*Grieb v. Church & Dwight Co., Inc.*
CLASS ACTION COMPLAINT